**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALTICOR INC. and AMWAY CORP., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No: 1:24-cv-3076 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| FERNANDO GABRIEL BRYNER, MARIA | ) | |
| INES MARTINETTI, STEPHANIE BRYNER, | ) | |
| ARIEL SZRUT, MARIANO BRYNER, and | ) | |
| JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR
VIOLATION OF 15 U.S.C §§ 1114, 1125(A), AND RELATED STATE CLAIMS**

Plaintiffs Alticor Inc. and Amway Corp. (collectively, "Plaintiffs") bring this action against defendants Fernando Gabriel Bryner, Maria Ines Martinetti, Stephanie Bryner, Ariel Szrut, Mariano Bryner, and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (4) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (5) common law trademark infringement and unfair competition; (6) violation of the Illinois Uniform Deceptive Trade Practices Act; and (7) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of Plaintiffs' trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Plaintiffs' trademarks to unwitting customers. In support of their Complaint, Plaintiffs allege as follows:

1

## PARTIES

1. Alticor Inc. ("Alticor") is a corporation, organized under the laws of the State of Michigan, with its principal place of business located in Ada, Michigan. Alticor is the parent company of Amway Corp. and the owner of the Amway family of trademarks and all associated intellectual property rights.

2. Amway Corp. ("Amway") is a corporation, organized under the laws of the State of Virginia, with its principal place of business located in Ada, Michigan.

3. Fernando Gabriel Bryner ("Fernando") is a natural person who is listed as the owner and operator of an online storefront on www.amazon.com ("Amazon") that is currently called "Punta y Taco." The "Punta y Taco" Amazon storefront can be accessed at https://www.amazon.com//sp?seller=A1CZ4S7B6R9X7D. Fernando sells infringing products bearing Plaintiffs' trademarks through the "Punta y Taco" Amazon storefront and does business throughout the United States through the storefront, including in Illinois.

4. Maria Ines Martinetti ("Martinetti") is a natural person who is listed as the owner and operator of an online storefront on Amazon that is currently called "detailingstore." The "detailingstore" Amazon storefront can be accessed at https://www.amazon.com//sp?seller=A297TMS5U2EQ98. Martinetti sells infringing products bearing Plaintiffs' trademarks through the "detailingstore" Amazon storefront and does business throughout the United States through the storefront, including in Illinois.

5. Stephanie Bryner ("Stephanie") is a natural person who is listed as the owner and operator of an online storefront on Amazon that is currently called "Asado Grocery." The "Asado Grocery" Amazon storefront can be accessed at https://www.amazon.com//sp?seller=A1FB11ORZULVVP. Stephanie sells infringing products

2

bearing Plaintiffs' trademarks through the "Asado Grocery" Amazon storefront and does business throughout the United States through the storefront, including in Illinois.

6.     Ariel Szrut ("Szrut") is a natural person who is listed as the owner and operator of an online storefront on Amazon that is currently called "aszrut." The "aszrut" Amazon storefront can be accessed at https://www.amazon.com//sp?seller=A2M4IIVDVNVPF5. Szrut sells infringing products bearing Plaintiffs' trademarks through the "aszrut" Amazon storefront and does business throughout the United States through the storefront, including in Illinois.

7.     Mariano Bryner ("Mariano") is a natural person who is listed as the owner and operator of an online storefront on Amazon that is currently called "Highline Store." The "Highline Store" Amazon storefront can be accessed at https://www.amazon.com//sp?seller=A10UM707106QX7. Mariano sells infringing products bearing Plaintiffs' trademarks through the "Highline Store" Amazon storefront and does business throughout the United States through the storefront, including in Illinois.

8.     Plaintiffs believe that Fernando, Martinetti, Stephanie, Szrut, and Mariano all reside in Buenos Aires, Argentina and are acting in concert to sell infringing products bearing Plaintiffs' to consumers in the United States through the "Punta y Taco," "detailingstore," "Asado Grocery," "aszrut," and "Highline Store" Amazon storefronts (collectively, the "Amazon Storefronts"). As discussed below in more detail, two of the Amazon Storefronts openly state that their owners reside in Argentina and provide "Business Addresses" for the owners that are located next door to one another in Buenos Aries, Argentina. The three other Amazon storefronts list "Businesses Addresses" located in Texas and Kansas, but Plaintiffs have found that those addresses are merely private mailboxes located at shipping and mailing businesses. Further, Plaintiffs have purchased products from the three Amazon Storefronts that list United States addresses and received products

that were manufactured in and shipped out of Argentina, showing that the storefronts are actually owned and operated by individuals residing in Argentina.

9.      Accordingly, upon information and belief, Fernando, Martinetti, Stephanie, Szrut, and Mariano are all located in Argentina but are using their Amazon Storefronts to reach into the United States and do business with United States consumers.

10.     Plaintiffs believe that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Plaintiffs. Therefore, Plaintiffs sue these defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, Plaintiffs will seek leave to amend this Complaint accordingly. If Plaintiffs do not not identify any such parties, Plaintiffs will dismiss these defendants from this action.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Plaintiffs' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and their claims arising under the laws of the State of Illinois are substantially related to their federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(2) and the Due Process Clause because Defendants are not subject to jurisdiction in any state's courts of general jurisdiction and have purposefully availed themselves of the privilege of conducting activities and causing a consequence in the State of Illinois by advertising

4

and regularly selling substantial quantities of infringing products bearing Plaintiffs' trademarks to consumers within Illinois through a highly interactive commercial website. Plaintiffs' claims arise out of Defendants' substantial and regular sales of infringing products bearing Plaintiffs' trademarks to Illinois residents.

13.     Defendants' sales of infringing products bearing Plaintiffs' trademarks into Illinois have included, but are not limited to, sales of five infringing products to Plaintiffs' local counsel in Chicago, Illinois. Defendants structure their sales activity to invite consumers from Illinois to purchase from their Amazon Storefronts, and on or about March 21, 2024, Defendants caused five infringing products bearing Plaintiffs' trademarks to be delivered to Plaintiffs' agent in Chicago after one product was purchased from each of Defendants' five Amazon Storefronts.

14.     In addition to their sales to Plaintiffs, Defendants have also sold, and continue to regularly sell, a high volume of other infringing products bearing Plaintiffs' trademarks into Illinois to other Illinois residents.

15.     Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Plaintiffs and Their Trademarks

16.     Plaintiffs are worldwide leaders in developing, manufacturing, and providing nutrition, beauty, bath and body, cookware, household, and other products to consumers under various brands, including Amway®, Nutrilite®, and Artistry® (collectively, "Amway products"). Plaintiffs permit Amway products to be sold to U.S. consumers only through Amway.com and

through Amway Independent Business Owners ("IBOs"), which enter into contracts with Amway to be able to sell Amway products.

17.     Plaintiffs devote a significant amount of time, energy, and resources toward protecting the value of their brands, products, name, and reputation.  By distributing products exclusively through their own website and through IBOs, Plaintiffs ensure the safety, well-being, and satisfaction of consumers and maintain the integrity and reputation of the Amway family of brands.  IBOs provide users of Amway products with explanation and guidance about the safe and proper use of Amway products.  IBOs are required by their contracts with Amway to exercise strict quality control requirements over the products they sell to consumers.  In the highly competitive nutrition and household product market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

18.     To promote and protect the Amway family of brands, Alticor has registered numerous trademarks with the United States Patent and Trademark Office.  These trademarks include, but not are limited to: AMWAY® (U.S. Trademark Registration Nos. 4,031,832, 4,199,852, and 4,289,794), NUTRILITE® (U.S. Trademark Registration Nos. 402,891, 689,389, 2,145,912, 3,535,340, 4,748,189, and 4,478,190), and ARTISTRY® (U.S. Trademark Registration Nos. 856,184, 1,505,505, 1,519,877, and 4,645,525), (collectively, the "Amway Trademarks").

19.     Alticor has licensed the Amway Trademarks to various subsidiaries, including Amway.

20.     The registration for each of the Amway Trademarks is valid, subsisting, and in full force and effect.

21.     Plaintiffs actively use and market all of the Amway Trademarks in commerce.

22.     Due to the quality and exclusive distribution of Amway products, and because Plaintiffs are recognized as the sources of high quality products, the Amway Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to Plaintiffs' Quality Controls, Reputation, and Goodwill

23.     E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2023, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 15.6%.  *E-Commerce Retail Sales as a Percent of Total Sales*,     Federal     Reserve     Bank     of     St.     Louis     (February     20,     2024), https://fred.stlouisfed.org/series/ECOMPCTSA.

24.     In 2022 consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021.  *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce 360  (February  17,  2023),  https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

25.     Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

26.     Unlike when purchasing products at a brick-and-mortar store or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the brand owner.

7

27.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

28.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  See Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market*," CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   See Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

29.    The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the

8

marketplaces are genuine. See Spencer Soper, *Amazon Gets Real About Fakes*, BLOOMBERG, Nov. 28, 2016, https://www.bloomberg.com/ news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/ technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

30.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue. The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms. The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online. See Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

31.     In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-

9acc-1a89df23d0f3.pdf    Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

32.    Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no way to exercise their quality controls over products sold by unauthorized sellers or ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, some of a brand owner's products are ingested by consumers.

33.    The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

34.    When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the manufacturer or brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

35.    For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

36.     When a customer purchases on a marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or of otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

37.     Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about disappointing products: online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

38.     Online product reviews significantly impact a brand's reputation. Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews. Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

39.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews. For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family. Jamie Pitman, *Local      Consumer      Review      Survey      2022*,      BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.   Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019,

https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

40.     Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html. According to one study, 85% of consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

41.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's reputation and goodwill.

**Plaintiffs' Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written By Customers Who Purchased Poor Quality Products from Unauthorized Sellers On Online Marketplaces**

42.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

43.     Numerous consumers have written negative reviews of Amway products being offered for unauthorized sale on online marketplaces.  In these reviews, many of which appear on

listings of products that have been offered for sale by Defendants through their Amazon Storefronts, consumers have given misappropriated Amway products low "ratings" and complained of receiving products that were intended for sale in other countries and had non-English writing, expired, near-expired, tampered with, previously used, unsealed, allegedly counterfeit, or of otherwise poor quality or different from what consumers had purchased.

44.     For example, Defendants have sold on Amazon the Amway product seen in the screenshot below:




45.     As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were expired, near-expired, tampered with, previously used, missing contents, damaged, allegedly counterfeit, intended for sale in other countries and lacking English writing, or of otherwise poor quality or different from what consumers had purchased:

13

 Amazon Customer

★☆☆☆☆ **Missing the Case**

Reviewed in the United States on December 31, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

Product come right away...but is missing the case.. so can't give to someone like a gift until I finish my first vitamins so I can empty my current case in order to give as well the vitamins.. so not sure why..because first time when I bought it..I DID HAVE THE CASE AS WELL THE VITAMINS..



One person found this helpful

---

 Bruce

★☆☆☆☆ **FAKE**

Reviewed in the United States on November 1, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

It is not Nutrilite. Look closer it is Nutriway. FAKE!!!! I just realized and threw away the rest immediately.



2 people found this helpful

---

 J2

★☆☆☆☆ **Expired goods**

Reviewed in the United States on September 20, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

Expired product sent. Poorly stored as well. Packaging falling apart. Very disappointing. Will not be purchasing again.

One person found this helpful

---

 Katerin chavez

★☆☆☆☆ **Fake**

Reviewed in the United States on September 8, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

Este producto es falso no lo compres no es el mismo de la foto ni delos productos amway ni lo puedes devolver 



2 people found this helpful

 Aronled

⭐☆☆☆☆ **1/2 of the product I ordered was missing**

Reviewed in the United States on July 26, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

Still having exponential problems getting a refund

One person found this helpful

---

 Cygnus1129

⭐☆☆☆☆ **False description of products sold**

Reviewed in the United States on July 21, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

Item does not come with gray. FALSE advertisement. Do not buy. Very dissatisfied. Will not buy from again.

One person found this helpful

---

 Filippo Mazzei

⭐☆☆☆☆ **About to expire !!!**

Reviewed in the United States on July 16, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

I don't like when the products about to expire



One person found this helpful

---

 julie e hayden

⭐☆☆☆☆ **Short lead time on supplements**

Reviewed in the United States on July 12, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

I didn't like that the packaging was mostly written in a foreign language which I could read.
Also, the expiration date on the supplements was August 2023, which I don't think is sufficient. Also, I was unaware that this item was not returnable

---

 Kelly

⭐⭐☆☆☆ **The information is all in what I think is Spanish**

Reviewed in the United States on April 21, 2023

Size: 3 Count (Pack of 1) | **Verified Purchase**

The information is all in what I think is Spanish. The expiration date is this September 2023. The product is probably alright from what I can tell. It just looks like the sealer is trying to get rid of old stock they couldn't sale. I have used this product years ago and it was good then. I just wish the information was in English and expiration wasn't so close.

3 people found this helpful



46.     Below is a screenshot of another Amway product that Defendants have sold on Amazon:





47.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were tampered with, unsealed, and intended for sale in other countries with non-English writing:

 Jose

★☆☆☆☆  **It's not the original, not the same item as in the picture**
Reviewed in the United States on June 7, 2023
**Verified Purchase**

It's not what is show in the picture. My bottle it's open, do not have a seal



4 people found this helpful

 Gino yvon

★☆☆☆☆  **not in english**
Reviewed in the United States on May 15, 2023
**Verified Purchase**

not in english

3 people found this helpful

 Amazon Customer

★☆☆☆☆  **Safety seal compromised**
Reviewed in the United States on May 10, 2023
**Verified Purchase**

Seal came off with cap. Unsure if product was tampered with

One person found this helpful

 lorylei seda

★☆☆☆☆  **PRODUCT IN ANOTHER LANGUAGE**
Reviewed in the United States on March 9, 2023
**Verified Purchase**

Not sure if this is a true nurtilite product. It's not in English how am I supposed to take these never will order it again waste of money and my time



7 people found this helpful

17

48. Below is a screenshot of another Amway product that Defendants have sold on Amazon:



NUTRILITE OCEAN ESSENTIALS Heart Health - 90 softgels

Brand: Nutrilite

4.3 ★★★★☆ | 155 ratings | Search this page

200+ bought in past month

$36⁹⁰ ($0.41 / Count)

Get $10 off instantly: Pay $26.90 upon approval for the Amazon Store Card.

Available at a lower price from other sellers that may not offer free Prime shipping.

| Brand | Nutrilite |
| --- | --- |
| Unit Count | 90.00 Count |
| Item Form | Softgel |
| Item Weight | 0.24 Pounds |
| Product Benefits | Heart Health Support |
| Age Range (Description) | Adult |

∨ See more

**About this item**

- The benefits of EPA and DHA for those that can't or don't eat fish daily; Both EPA and DHA support healthy cell function
- No added artificial colors or flavors
- Support for normal blood lipid levels and healthy blood flow, which is great for individuals concerned about their heart health

49. As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that came from other countries and had non-English writing or were otherwise different from what consumers had purchased, causing consumers to question if the products were authentic or counterfeit:



 Jennifer Fetterplace

★☆☆☆☆ **Picture does not match what is received.**

Reviewed in the United States on March 21, 2023

**Verified Purchase**

As indicated by other reviewers, the product and description posted does not match what is received.

One person found this helpful

 Somporn kanphat

★☆☆☆☆ **I don't think it's a real Amway.**

Reviewed in the United States on February 28, 2023

**Verified Purchase**

I took three or four and I stopped because I'm not sure if it's real Amway or not.



 Did not match product description!

★☆☆☆☆ **Product and description posted does not match**

Reviewed in the United States on February 23, 2023

**Verified Purchase**

HORRIBLE. Actual product do not match description of product posted. Very disappointed!



50.     Below is a screenshot of another Amway product that Defendants have sold on Amazon:





**Amway 2 x GLISTER MULTI-ACTION FLUORIDE TOOTHPASTE**
Brand: Glister
4.6 ★★★★½ ⌄ | 5,000 ratings | Search this page
800+ bought in past month

$17⁵⁰ ($17.50 / count)

✓prime Two-Day
Get a $100 Amazon Gift Card instantly upon approval for Prime Visa. No annual fee.
May be available at a lower price from other sellers, potentially without free Prime shipping.

| Flavor | Peppermint |
| Age Range (Description) | Baby |
| Item Form | Paste |
| Material Feature | Natural |
| Item Weight | 6.75 Ounces |

Report an issue with this product or seller

51.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were previously used and opened, tampered with, damaged, and allegedly counterfeit:



20

 Gulnara

⭐☆☆☆☆ **This tooth paste fake, more reviews fake to!**
Reviewed in the United States on October 25, 2023
**Verified Purchase**



---

 Iana Kozyrkova

⭐☆☆☆☆ order a used item?
Reviewed in the United States on February 24, 2024
**Verified Purchase**

I just received an order. I ordered a lot of things but only toothpaste arrived open and used. I didn't order a used item!



---

 mavase

⭐☆☆☆☆ **It came with 2 inch hole in one of the 2 the tubes**
Reviewed in the United States on July 19, 2023
**Verified Purchase**

It has a about 2 inch cut hole in one out of 2 tubes
Looks like it happened before it was shipped



---

 WNDA BARRON

⭐☆☆☆☆ **Product damaged**
Reviewed in the United States on April 27, 2023
**Verified Purchase**

I have always used to Amways glister. This one seems to be a new one plant-based or some thing but what I really wanted to share with you is that the packages were smashed and part of the actual tube itself was smashed unacceptable and Amway deliveries or even Amazon deliveries what do I do next? I do not do videos or pictures.

52.   The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Amway products listed on the Amazon website that Defendants have sold through their Amazon Storefronts.

53.   Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Amway Trademarks on Amazon and are not subject to Plaintiffs' quality controls, however, it is likely that some of the foregoing negative reviews—and the many other similar reviews of Amway products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Amway Trademarks from Defendants.

**Plaintiffs Prohibit Sales on Online Marketplaces, Exercise Strict Quality Controls Over the Production and Distribution of Amway Products, and Provide a Guarantee for Products Purchased from IBOs**

54.   To maintain quality controls over Amway products, Plaintiffs allow Amway products to be sold in the United States only by Plaintiffs themselves (through Amway.com) or by IBOs.

55.   Because of the threats to their goodwill and consumer safety that are caused by sales on online marketplaces, as discussed above, Plaintiffs do not sell Amway products on any online marketplace and strictly prohibit IBOs from selling Amway products on any online marketplace.

56.   IBOs must enter into contracts with Amway to be permitted to sell Amway products.  These contracts authorize IBOs to sell Amway products only in certain channels and require IBOs to provide various customer services and exercise various quality controls over Amway products (collectively, the "Amway Rules").  Amway enforces the quality controls established in the Amway Rules and its contracts with IBOs, and its ability to maintain quality

22

controls is essential to the integrity and safety of Amway products, the value of the Amway Trademarks, and the safety and satisfaction of consumers.

57. The Amway Rules expressly prohibit IBOs from selling Amway products on the Internet unless they use an authorized Amway.com platform.

58. The Amway Rules require, among other customer service requirements and protections, that IBOs provide customers with vital information regarding Amway products and their uses. This person-to-person interaction between IBOs and their customers allows for explanation and guidance on the safe and proper use of Amway products. To this end, the Amway Rules prohibit IBOs from selling or displaying Amway products in retail establishments.

59. Under the Amway Rules, IBOs must also provide personal services to customers concurrently with and after their sales. IBOs have access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits. IBOs are therefore uniquely qualified to explain best practices for safe and optimal use of Amway products, and these services of course cannot be provided by non-IBOs who sell Amway products.

60. IBOs are also trained and instructed to present only complete and truthful information about Amway's products and services, and must refer only to the statements permitted in authorized literature. It is essential to consumer well-being and Plaintiffs' reputation that customers are able to make fully informed decisions about whether to purchase Amway products and which products to purchase. The Amway Rules prohibit IBOs from providing misleading or false information to customers, and Amway monitors its IBOs to ensure that IBOs do not violate these prohibitions.

61. To ensure that customers receive products of the quality they have come to expect from Plaintiffs, IBOs are prohibited from altering any Amway product, label, or accompanying

literature. IBOs may sell Amway products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Amway products. IBOs must explain to customers that Amway products are safest when used as directed on the product labels.

62. IBOs must also follow storage and handling requirements for all Amway products, including storing products in a cool, dry place and ensuring that products are never exposed to freezing temperatures. Numerous Amway products are permanently damaged if they are allowed to freeze.

63. Amway tracks all purchases of Amway products from Amway.com and from IBOs, so that it can conduct a recall or disseminate other important consumer safety information in the event that a quality control issue arises. Amway is not able to track products that are sold outside of authorized channels and, thus, unable to alert customers who purchased from unauthorized sellers if a quality issue arises.

64. For all of these reasons, Plaintiffs limit third party sales of their products to IBOs who have access to, and must follow, the Amway Rules. By so limiting their sales, Plaintiffs are able to protect the safety of their consumers and maintain the integrity and reputation of the Amway family of brands.

65. Amway also prohibits IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell those products on the Internet (including on Amazon). The purpose of this restriction is to ensure that Amway products are sold to consumers only by Plaintiffs themselves or by IBOs who are subject to and follow Plaintiffs' quality controls.

66. Amway also provides customers who purchase Amway products through authorized chains of distribution with the Amway Satisfaction Guarantee ("Satisfaction

Guarantee"), which allows customers who are not completely satisfied with an Amway product to receive a refund or product replacement within 180 days of purchase. Customers who purchased Amway products from IBOs are given a full refund, credit, or a product exchange by the IBO from whom they purchased their product. Customers who purchased products from Amway.com may return their products to Amway, in accordance with return instructions on their product's official packing slip.

67. Amway offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Plaintiffs' quality controls and have agreed to follow their quality controls—specifically, IBOs and Plaintiffs themselves. Because non-IBOs are not subject to Plaintiffs' quality controls and Amway cannot therefore ensure the quality of products sold by non-IBOs, the Satisfaction Guarantee is not available for Amway products purchased from any third party who is not an IBO.

**Plaintiffs' Discovery of Defendants' Sales of Amway Products on the Internet**

68. Because the unauthorized sale of Amway products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Amway Trademarks, Plaintiffs actively monitor the sale of Amway products online.

69. Through these efforts, Plaintiffs discovered that high volumes of products bearing the Amway Trademarks were being sold on Amazon through storefronts called "Punta y Taco," "detailingstore," and "Asado Grocery."

70. The "Punta y Taco" storefront lists the "Business Name" of the operator of the storefront as "Fernando Gabriel Bryner." The "detailingstore" storefront lists the "Business Name" of the operator of the storefront as "Maria Ines Martinetti." The "Asado Grocery" storefront lists the "Business Name" of the operator of the storefront as "Stephanie Bryner."

71. The "Punta y Taco", "detailingstore", and "Asado Grocery" storefronts also each list a "Business Address" for the storefront owner that is located in the United States. Specifically, the "Punta y Taco" storefront lists a "Business Address" at 1321 Upland Dr., Suite 7326, Houston, Texas 77043, the "detailingstore" storefront lists a "Business Address" at 1321 Upland Dr., #1923, Houston, Texas 77043, and the "Asado Grocery" storefront lists a "Business Address" at 4925 S. Broadway Ave., Suite 4013, Wichita, Kansas 67216:

**Detailed Seller Information**

**Business Name:** Fernando Gabriel Bryner
**Business Address:**
1321 Upland Dr
SUITE 7326
Houston
Texas
77043-4718
US

**Detailed Seller Information**

**Business Name:** Maria Ines Martinetti
**Business Address:**
1321 Upland Drive PMB #1923
Houston
Texas
77043
US

**Detailed Seller Information**

**Business Name:** Stephanie Bryner
**Business Address:**
4925 S Broadway Ave
Suite 4013
Wichita
Kansas
67216
US

72. Through investigation, however, Plaintiffs have determined that the owners of the "Punta y Taco," "detailingstore," and "Asado Grocery" storefronts are not located at the addresses listed on the storefronts and instead appear to be located in Argentina.

73. First, Plaintiffs discovered that the "suite" addresses listed on the storefronts are actually mailboxes located at shipping and mailing businesses rather than legitimate business addresses. 1321 Upland Dr., Houston, Texas 77043—which is listed on both the "Punta y Taco" and "detailingstore" storefronts—is the location of a business called US Global Mail that rents mailboxes and forwards mail it receives to its customers who are located elsewhere. *See* https://www.usglobalmail.com/help_category/available-addresses-for-mailforwarding/. "Suite 7326" and "#1923" at 1321 Upland Dr., Houston, Texas 77043—the listed business addresses for the "Punta y Taco and "detailingstore" storefronts—are mailbox numbers, not "suites" or places of business. Similarly, 4925 S. Broadway, Wichita, KS 67216—the address listed on the "Asado Grocery" storefront—is the location of a business called 47th Mail & Print that rents mailboxes to customers and provides mail forwarding services. *See* https://www.47thmailandprint.com/Home-Business/Mailbox-Rental. "Suite 4013" at 4925 S. Broadway, Wichita, KS 67216—the listed business address for the "Asado Grocery" storefront—is a private mailbox, not a business address.

74. Second, Plaintiffs made test purchases of products bearing the Amway Trademarks from the "Punta y Taco", "detailingstore", and "Asado Grocery" storefronts and received products that were manufactured and intended for sale in Argentina, not the United States. Language on the products and their packaging was written in English, not Spanish, and the products also had different ingredients and formulas from their counterparts that were intended for sale in the United States. Although Plaintiffs made their test purchases from listings that advertised products intended for sale in the United States, the products that were sold by the "Punta y Taco",

"detailingstore", and "Asado Grocery" storefronts were Argentina versions of the products bearing the Amway Trademarks Plaintiffs had purchased.

75.     Because the "Punta y Taco", "detailingstore", and "Asado Grocery" storefronts are selling products intended for sale in Argentina and the supposed "Business Addresses" listed on the storefronts are actually only mailboxes that do not reflect the location of the individuals operating the storefronts, Plaintiffs concluded that the operators of these storefronts are located within Argentina rather than in the United States.

76.     After Plaintiffs discovered the "Punta y Taco," "detailingstore," and "Asado Grocery" storefronts, Plaintiffs discovered two more Amazon storefronts called "aszrut" and "Highline Store" that were also selling high volumes of products bearing the Amway Trademarks. Further, in contrast to the "Punta y Taco," "detailingstore," and "Asado Grocery" storefronts that list "Business Addresses" located in the United States, the "aszrut" and "Highline Store" storefronts list addresses in Buenos Aries, Argentina that are located next door to one another on the same street:

**Detailed Seller Information**

**Business Name:** Ariel Szrut
**Business Address:**
    Remedios de Escalada de San Martin 1096
    Buenos Aires
    Capital Federal
    1416
    AR

**Detailed Seller Information**

**Business Name:** Mariano Bryner
**Business Address:**
    Remedios de Escalada de San Martin 1098
    Piso 1 - Departamento 8
    Capital Federal
    Buenos Aires
    C1416CVL
    AR

77.    Through test buys, Plaintiffs discovered that the "aszrut" and "Highline Store" Amazon storefronts are also selling products bearing the Amway Trademarks that are intended for sale in Argentina even though the storefronts list products that are intended for sale in the United States rather than Argentina.

78.    Because the "aszrut" and "Highline Store" Amazon storefronts are selling products bearing the Amway Trademarks that are intended for sale in Argentina and the storefronts list "Business Addresses" that are located in Argentina, Plaintiffs concluded that—like the operators of the "Punta y Taco", "detailingstore", and "Asado Grocery" storefronts—the operators of the "aszrut" and "Highline Store" are located within Argentina rather than in the United States.

79.    Plaintiffs also believe that the individuals who operate the "Punta y Taco", "detailingstore", "Asado Grocery", "aszrut", and "Highline Store" Amazon storefronts are all acting in concert to sell products bearing the Amway Trademarks to consumers in the United States.  The Amazon Storefronts list many of the same products bearing the Amway Trademarks, and three of the listed operators of the Amazon Storefronts have the same surname.  "Fernando Gabriel Bryner" is listed as the operator of "Punta y Taco", "Stephanie Bryner" is listed as the operator of "Asado Grocery", and "Mariano Bryner" is listed as the operator of "Highline Store." Plaintiffs have also not observed or discovered any other Amazon storefronts that are selling

products bearing the Amway Trademarks that are intended for sale in Argentina or that list "Business Addresses" located in Argentina despite advertising United States versions of products to United States consumers.

80. Based on these facts and its investigation, Plaintiffs believe that Fernando, Martinetti, Stephanie, Szrut, and Mariano are all acting in concert and responsible for the unlawful sale of products bearing the Amway Trademarks through the five Amazon Storefronts: "Punta y Taco", "detailingstore", "Asado Grocery", "aszrut", and "Highline Store." Discovery may reveal that other individuals and/or entities in addition to Fernando, Martinetti, Stephanie, Szrut, and Mariano are also responsible for the conduct complained of herein.

81. The only Argentinian addresses that Plaintiffs have for Fernando, Martinetti, Stephanie, Szrut, and Mariano are the two addresses that are listed on the "aszrut" and "Highline Store" storefronts: (1) Remedios Escalada de San Martín 1096, Buenos Aires, Argentina; and (2) Remedios Escalada de San Martín 1098, Buenos Aires, Argentina (the "San Martin Addresses"). Through investigation, Plaintiffs have determined that the San Martin Addresses are located next door to one another on the same street in Buenos Aires.

82. Plaintiffs will attempt to personally serve Fernando, Martinetti, Stephanie, Szrut, and Mariano with process at the San Martin Addresses. If Defendants cannot be physically found or otherwise located through attempts to serve process at the San Martin Addresses, however, Plaintiffs may seek leave to serve Defendants through alternative service of process. Plaintiffs have been provided contact email addresses for some of Defendants' Amazon Storefronts by Amazon, and Plaintiffs can also communicate with and send attachments to Defendants through a messaging system on the Amazon website that Defendants rely on to conduct their online business. These electronic modes of communication may be the only way to reach Defendants because they

have displayed false "Business Addresses" on their "Punta y Taco," "detailingstore," and "Asado Grocery" storefronts and may not be found at the San Martin Addresses that are listed on the "aszrut" and "Highline Store" storefronts.

83.     Beginning in November 2022 and continuing through January 2024, Plaintiffs have sent cease-and-desist letters to Defendants at the physical addresses listed on Defendants' Amazon Storefronts and to email addresses that Amazon has provided as contact information for some of the Amazon Storefronts.  Plaintiffs' letters explained that Defendants are infringing the Amway Trademarks through their online sales and causing harm to Plaintiffs.  Plaintiffs' letters also explained that IBOs are not permitted to sell Amway products on online marketplaces, including on Amazon.  Plaintiffs' letters demanded that Defendants permanently cease selling products bearing the Amway Trademarks and disclose every person and entity that provided Defendants with the products they had listed for sale on their Amazon Storefronts.

84.     As of the time of filing, Defendants have not responded to any of Plaintiffs' cease-and-desist letters and have continued to advertise and sell products bearing the Amway Trademarks through their Amazon Storefronts.

85.     Defendants' disregard of Plaintiffs' cease-and-desist letters and their continued sale of non-genuine products despite being informed of their unlawful conduct demonstrate that Defendants are acting intentionally, willfully, and maliciously.

86.     Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Amway Trademarks through their Amazon Storefronts.  Monitoring software estimates that Defendants have sold more than 15,000 infringing products through their Amazon Storefronts for revenue in excess of $580,000.

87.     Upon information and belief, through their storefronts on the highly interactive Amazon website, Defendants accept and fulfill orders from Illinois residents for products bearing the Amway Trademarks and cause substantial quantities of infringing products bearing the Amway Trademarks to be shipped to persons located in Illinois through the regular course of business. Defendants have taken no steps to prevent persons located in Illinois from purchasing products from their Amazon Storefronts.

88.     As of the time of filing, Defendants' Amazon Storefronts are called "Punta y Taco", "detailingstore", "Asado Grocery", "aszrut", and "Highline Store."  Amazon allows storefront operators to change the name of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The "Merchant ID numbers" for Defendants' Amazon Storefronts, respectively, are A1CZ4S7B6R9X7D, A297TMS5U2EQ98, A1FB11ORZULVVP, A2M4IIVDVNVPF5, and A10UM707106QX7.  Even if Defendants change the named of their Amazon Storefronts at some time in the future, the storefronts can always be accessed at the following links that include the storefronts' Merchant ID numbers:

    a.  https://www.amazon.com//sp?seller=A1CZ4S7B6R9X7D    (currently    called "Punta y Taco")

    b.  https://www.amazon.com//sp?seller=A297TMS5U2EQ98    (currently    called "detailingstore")

    c.  https://www.amazon.com//sp?seller=A1FB11ORZULVVP    (currently    called "Asado Grocery")

    d.  https://www.amazon.com//sp?seller=A2M4IIVDVNVPF5    (currently    called "aszrut")

e.    https://www.amazon.com//sp?seller=A10UM707106QX7    (currently    called

"Highline Store")

**Defendants Are Infringing the Amway Trademarks by Selling Products Bearing The
Amway Trademarks That Are Not Subject To, Do Not Abide By, and Interfere with
Plaintiffs' Quality Control and Customer Service Requirements**

89.    Fernando, Martinetti, Stephanie, Szrut, and Mariano are not and have never been

Amway IBOs, are not subject to Plaintiffs' quality controls, and do not comply with the Amway

Rules or the quality controls that Plaintiffs require IBOs to follow.

90.    Defendants, without authorization from Plaintiffs, have sold—and are continuing

to sell—products bearing the Amway Trademarks through their Amazon Storefronts.  Defendants

may also be selling products into the United States through additional storefronts on Amazon or

other channels that Plaintiffs have not yet discovered, and cannot discover until they are able to

take discovery.

91.    Plaintiffs have implemented quality control and customer service requirements

throughout their authorized channels of distribution.  The products sold by Defendants are not

genuine Amway products because they are not subject to, and interfere with, Plaintiffs' quality

control and customer service requirements that IBOs must follow.

92.    Plaintiffs' quality control and customer service requirements are legitimate and

substantial.  As a result of Defendants' sales of products that are not subject to these requirements,

Plaintiffs have lost control of the quality of goods that bear their trademarks.  For example,

Plaintiffs have no control over whether Defendants carry out the storage and handling requirements

that IBOs are required to follow or whether Defendants sell products that are damaged, defective,

repackaged, or otherwise altered.

93.     Defendants are also interfering with Plaintiffs' quality control and customer service requirements, among other ways, because Plaintiffs cannot track or conduct a recall of products that Defendants sell to consumers.  Defendants also do not advise—and are not capable of advising—customers about product information and best practices for safe and optimal use of Amway products because, as non-IBOs, they do not have access to the approved literature and other educational materials that IBOs are given to perform these services.

94.     Customers have written numerous reviews of Defendants' Amazon Storefronts in which they complained of receiving products—including products bearing the Amway Trademarks—that were intended for sale in other countries and had non-English writing, totally different from what customers had ordered, tampered with, previously used, unsealed and opened, rotten, near-expired, damaged, and counterfeit.  Although Amazon has added comments to some of these reviews stating that Amazon takes "responsibility" for the "fulfillment experiences" described in the reviews, the issues and complaints that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants:[1]

| ★☆☆☆☆ | "The package is in Spanish and not the usual kind I get. I am not sure what happened because I have always ordered from here and gotten the same product as displayed on the picture. And this item does not offer a return or replacement. " |
| | Read less |
| | By Cindy Wang on April 13, 2024. |

| ★☆☆☆☆ | "I bought 4 and one was without the cover or lid. That's bad customer service. With a lid on it how do you expect me to use it? That's very bad customer service " |
| | By Abdullai M. on March 10, 2024. |

---

[1] When Amazon sellers utilize the "Fulfillment by Amazon" service, Amazon itself is responsible for shipping the items.  At a third-party seller's request, Amazon is able to "strike" a negative review as attributable to Amazon, not the seller—even in situations where, as here, the issues are plainly related to the quality of the seller's product.  *See* https://sell.amazon.com/fulfillment-by-amazon.

★☆☆☆☆ "I purchased Nutrilite Vitamin B Dual Action 120 Tablets and received a different product. Vitamin B, 60 tablets."

By Laura E. Brown on February 16, 2024.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "Punta y Taco is engaging in deceptive business on Amazon. They are selling contact solution under the listing Boston Advance Conditioning Solution, but the item they shipped me is Boston Advance Comfort Formula Conditioning Solution—it has a different formula and larger bottle. Additionally, the product they sent is not US market. Text on the box indicates it is Argentinian market."

Read less

By Lukas K. on January 30, 2024.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "When we opened the bottles of this product the pills had dark orange spots on some of the pills. Been taking this product for awhile and had never seen this. I..."

Read more

By Amazon Customer on January 6, 2024.

★☆☆☆☆ "When we opened the bottles of this product the pills had dark orange spots on some of the pills. Been taking this product for awhile and had never seen this. I tried to send back for a refund but it told me when I pushed the return product it said it was not returnable. I ordered same product but from a different vendor. Not happy that we can't return a what a would call a defective product."

Read less

By Amazon Customer on January 6, 2024.

★☆☆☆☆ "Hello. I need my money back it's totally rotten. I bought it for my children and my daughter saw that its lid was inflated. its spoiled"

By Anna Iozinina on December 21, 2023.

★☆☆☆☆ "product not in English"

By Nancy Henderson on December 9, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "I ordered the original version of the contact cleaner and received the advance version which I could have bought locally much cheaper."

By Ed Moreno on December 7, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "They send mexico products! It's totally different from picture!!! And they don't accept return!!! They are TOO BAD"

By Yoon K Byun on November 23, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★★☆☆☆ "I received the box in time. The box I received looks different than what was advertised. The box is in Spanish. The lot number and expiry dates on the box diffe..."

Read more

By AK on November 10, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "~~I bought this and it arrived with the labels torn , but thats not a problem, its the expiration date. It expires in a month and a half! Why is it so short?~~"

By John Kim on October 27, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

 "Package appeared to have been opened."

By Moises Suri on October 10, 2023.

★☆☆☆☆ "The product arrived late and was counterfeit. Not the product I ordered and have been using for years"

By Juliana Matteazzi on September 19, 2023.

★☆☆☆☆ "~~The package doesn't look like the one on the Amazon site. All of the wording on the box is in Spanish. Don't trust this at all! And I can't return it, which makes it worse!~~"

Read less

By mel on September 12, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

 "These are not the original strawberry and cream tic tacs. these are disgusting."

By Simba on September 3, 2023.

★☆☆☆☆ "~~This was a much smaller size and was all in Spanish. Not at all like description!~~"

By WannaTellU on September 1, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "~~Why are you listing something to purchase in English with English packaging, and what you get is a product that is manufactured in Argentina. Punta y Taco is the seller? WTF guys!!~~"

Read less

By Lori Rose on July 28, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "~~I ordered the product on their ad, the Artistry Renewing Activation Eye Cream. The product sent was not the eye cream. I returned it and reordered it again from the same seller. They sent the wrong product again. I returned it and will now shop from another seller to obtain this product. The seller should correct their ad if they are trying to substitute another product for the pictured one~~"

Read less

By Amazon Customer on July 22, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆ "~~My box of the te's was all broke and open !!! I don't even feel is secure to drink it!~~"

By mariana p. on July 22, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

| ★★★☆☆ | "Product was in Spanish." |
|---|---|
| | By Amazon Customer on July 9, 2023. |
| | **Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience. |

| ★☆☆☆☆ | "The product I saw and bought is not the same I received. Something different and in a different language I don't know. I receive the package last night, have to return right away." |
|---|---|
| | Read less |
| | By Maamebea on June 27, 2023. |
| | **Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience. |

| ★☆☆☆☆ | "The 2 items came haphazardly taped together and shipped in envelope instead the usual boxed shipment. Product boxes crushed. The usual enclosed dosing cards and instructions missing. Obviously opened prior to shipping." |
|---|---|
| | Read less |
| | By AG on June 12, 2023. |
| | **Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience. |

| ★☆☆☆☆ | "Three pack was open and even the cream was spilling out" |
|---|---|
| | By Monica on May 26, 2023. |
| | **Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience. |

| ★☆☆☆☆ | "Not original product. Its fake and listed as not returnable product" |
|---|---|
| | By Vardhini Samudrala on April 11, 2023. |

95.     These reviews are only a sample of the negative reviews that customers have written about Defendants and their Amazon Storefronts.  A significant reason why Plaintiffs allow Amway products to be sold only by IBOs who are subject to Amway's quality controls and prohibit IBOs from selling products on online marketplaces is to prevent customers from suffering experiences like those described in the negative reviews of Defendants' Amazon Storefronts.

96.     These reviews, along with the numerous negative customer reviews of Amway products that Defendants have sold, *see supra* ¶¶ 43-53, show that Defendants are very likely not following the quality control and personal service requirements that Amway requires IBOs to exercise when storing, handling, and selling Amway products.  Instead, Defendants are likely selling products bearing the Amway Trademarks to consumers that are expired, near-expired, tampered with, previously used, unsealed, rotten, and counterfeit.  Plaintiffs have also themselves

37

purchased products bearing the Amway Trademarks from Defendants' Amazon Storefronts that were manufactured for sale in Argentina rather than the United States, has writing in Spanish rather than English, and had different ingredients and formulas from their counterparts that were intended for sale in the United States. The reviews of Defendants' Amazon Storefronts show that many other consumers in the United States have also received Argentina-market products from Defendants after they purchased from listings that showed U.S.-market products and were confused and disappointed.

97. For all of these reasons, the products being sold by Defendants are also not genuine Amway products because they do not abide by Plaintiffs' quality control and customer service requirements that IBOs must follow.

98. Through their unauthorized use of the Amway Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Amway products. In reality, however, the products sold by Defendants are materially different from genuine Amway products because they are not subject to, do not abide by, and interfere with Plaintiffs' quality control and customer service requirements.

**Defendants Are Infringing the Amway Trademarks by Selling
Products Bearing The Amway Trademarks That
Do Not Come With the Amway Satisfaction Guarantee**

99. As set forth above, Amway products purchased from Plaintiffs or IBOs come with the Amway Satisfaction Guarantee. Amway, however, does not provide the Satisfaction Guarantee for products purchased from any third party who is not an IBO because Amway cannot ensure the quality of products sold by sellers that are not subject to Plaintiffs' quality controls.

38

100. Because Defendants are not IBOs and, thus, are not subject to Plaintiffs' quality control requirements, the products they sell bearing the Amway Trademarks do not come with the Satisfaction Guarantee.

101. Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Amway products.

102. The Satisfaction Guarantee is a material element of genuine Amway products. Consumers considering whether to purchase Amway products would find it relevant to their purchasing decision to know whether the product they are purchasing is eligible for the Satisfaction Guarantee. Consumers who purchase Amway products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Amway stands behind the product, and that they will have 180 days to get a refund, credit, or product replacement if they are dissatisfied with their product for any reason.

103. Defendants' unauthorized sale of products bearing the Amway Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Amway products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Infringing the Amway Trademarks and Engaging in False Advertising By Selling Into the United States Products Bearing The Amway Trademarks That Are Intended For Sale In Argentina**

104. In addition to selling products that do not come with the Amway Satisfaction Guarantee and are not subject to, interfere with, and to not abide by Plaintiffs' quality controls, Defendants are also selling products into the United States through their Amazon Storefronts that are intended for sale only in Argentina where Defendants reside.

105.     As discussed above, the Argentina-market products that Defendants are selling into the United States have numerous differences from products bearing the Amway Trademarks that are manufactured and intended for sale in the United States.  Language on Argentina-market products and their packaging is in Spanish rather than English, and Argentina-market products also have different ingredients and formulas from products bearing the Amway Trademarks that are intended for sale in the United States.

106.     Defendants do not advertise or otherwise represent to their customers that they are selling products intended for sale in Argentina into the United States.  Instead, Defendants sell their products on listings that depict and describe products bearing the Amway Trademarks that are intended for sale in the United States.  Defendants' representations that they are selling products bearing the Amway Trademarks that are intended for sale in the United States are false and misrepresent the nature and characteristics of the products that Defendants are listing for sale.

107.     The reviews of Defendants' Amazon Storefronts show that consumers do not expect to receive products with Spanish language that are intended for sale in Argentina when they purchase from Defendants.  *See supra* ¶¶ 94-96.  Defendants' unauthorized sale of products bearing the Amway Trademarks that are intended for sale in Argentina is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Amway products that are intended for sale in the United States when, in fact, they are not.

**Defendants Are Tortiously Interfering With Amway's Contracts
and Business Relationships With IBOs**

108.     As noted above, Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through IBOs.

109. Amway has entered into contracts with all of its IBOs that prohibit IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.

110. Defendants have sold and are continuing to sell a high volume of products bearing the Amway Trademarks on the Internet. The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more IBOs. Thus, upon information and belief, Defendants have purchased products from IBOs for the purpose of reselling them on the Internet.

111. Amway's contracts with its IBOs are a specific class of contract that Defendants are causing IBOs to breach when they purchase Amway products from IBOs. Although Plaintiffs do not yet know which specific IBO(s) have breached their contracts with Amway—and indeed cannot learn this information with certainty until they are able to take discovery from Defendants in this action—Defendants know how they obtained the products they have sold and are on notice of the basis for Plaintiffs' claim of tortious interference.

112. By purchasing Amway products from IBOs and then reselling them on the Internet, Defendants caused and induced IBOs to breach their contracts with Amway.

113. Defendants have known that Amway's contracts with IBOs prohibit IBOs from selling Amway products to third parties, such as Defendants, who the IBOs know or have reason to know are going to resell the products on the Internet.

114. Defendants have known of this prohibition, among other reasons, because Amway regularly broadcasts that it does not allow Amway products to be sold on online marketplace and auction websites such as Amazon. Experienced sellers of Amway products—such as

Defendants—are well aware that IBOs are prohibited from selling Amway products on such websites and from selling to resellers who sell on such websites.

115.     Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its IBOs by inducing IBOs to breach their contracts and sell Amway products to Defendants that Defendants resold on Amazon.

116.     In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Amway products from IBOs—and in so doing, instigated a breach of the IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Trademarks by reselling the products on the Internet, thereby committing an independent tort.

117.     Defendants are not parties to the contracts they caused IBOs to breach.

118.     If Plaintiffs learn through discovery that Defendants somehow did not obtain from any IBO any of the Amway products they have sold on the Internet, Plaintiffs will dismiss their claim for tortious interference.

**Plaintiffs Have Suffered Substantial Harm As A Result of Defendants' Conduct**

119.     As set forth above, the unauthorized sale of products bearing the Amway Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Amway family of brands.

120.     When a consumer receives a non-genuine, damaged, or otherwise poor quality or materially different product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Plaintiffs.  As such, Defendants' ongoing sale of non-genuine products bearing the Amway Trademarks harms Plaintiffs and their brnads.

121.     As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of their intellectual property, harm to the goodwill associated with the Amway family of brands, and damage to their existing and potential business relations.

122.     Plaintiffs are entitled to injunctive relief because Defendants will otherwise continue to sell unlawfully products bearing the Amway Trademarks that are materially different from genuine Amway products sold by IBOs and are outside of Plaintiffs' quality controls, thereby compromising Plaintiffs' quality controls.  Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to Plaintiffs' reputation, goodwill, business relationships, intellectual property, and brand integrity.

123.     Additionally, Plaintiffs are entitled to injunctive relief requiring Defendants to return or destroy infringing products because, without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

124.     Defendants' conduct was and is knowing, intentional, willful, intentional, malicious, wanton, and contrary to law.

**COUNT I**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)**

125.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

126.     Plaintiffs are the owner and licensee of the Amway Trademarks.

127.     Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

128.   The Amway Trademarks are valid and subsisting trademarks in full force and effect.

129.   Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

130.   The products that Defendants sell bearing the Amway Trademarks are not authorized for sale by Plaintiffs.

131.   Defendants' use of the Amway Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

132.   Defendants' use of the Amway Trademarks in connection with their unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

133.   The products sold by Defendants are not, in fact, genuine and authentic Amway products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee, are intended for sale Argentina rather than the United States, and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

134.   Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

135.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

136.    Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

137.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

138.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Amway Trademarks.

**COUNT II**
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

139.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

140.    As set forth above, Defendants are selling non-genuine products bearing the Amway Trademarks that are materially different from genuine Amway products.

141.    Defendants' sale of non-genuine products bearing the Amway Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Plaintiffs when they are not.

142.    Defendants' sale of non-genuine products bearing the Amway Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Amway products when they are not.

143.    Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

144.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

145.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

**COUNT III**
**False Advertising**
**15 U.S.C. § 1125(a)(1)(B)**

146.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

147.    Plaintiffs are the owner and licensee of the Amway Trademarks.

148.    Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

149.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

150.    Through their Amazon Storefronts, Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in interstate commerce for purposes of advertising, promoting, and selling products bearing the Amway Trademarks without Plaintiffs' consent.

151. Defendants' advertisements and promotions of their products unlawfully using the Amway Trademarks have been disseminated to the relevant purchasing public.

152. Through their Amazon Storefronts, Defendants are selling products bearing the Amway Trademarks into the United States that are intended for sale only in Argentina.

153. The Argentina-market products that Defendants are selling into the United States have numerous differences from products bearing the Amway Trademarks that are manufactured and intended for sale in the United States. Language on Argentina-market products and their packaging is in Spanish rather than English, and Argentina-market products also have different ingredients and formulas from products bearing the Amway Trademarks that are intended for sale in the United States.

154. Defendants do not advertise or otherwise represent to their customers that they are selling products intended for sale in Argentina into the United States. Instead, Defendants sell their products on listings that depict and describe products bearing the Amway Trademarks that are intended for sale in the United States.

155. Defendants' representations that they are selling products bearing the Amway Trademarks that are intended for sale in the United States are false because Defendants are actually selling products that are intended for sale in Argentina that have numerous differences from products intended for sale in the United States.

156. Defendants' misrepresentations are likely to deceive consumers and influence their purchasing decision because consumers would not expect to receive products that are intended for sale in Argentina, with Spanish-language writing on products and their packaging, when they purchase products that are depicted and advertised as intended for sale in the United States.

157.    Defendants' statements, used in connection with their unauthorized advertising, promotion, and sale of products bearing the Amway Trademarks, misrepresent the nature, characteristics, and qualities of the products they offer for sale.

158.    As a proximate result of Defendants' actions, Plaintiffs have suffered and will continue to suffer great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

159.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions, and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

160.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in false advertising.

**COUNT IV**
**Trademark Dilution**
**15 U.S.C. § 1125(c)**

161.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

162.    Products bearing the AMWAY® trademark have been sold to the public since 1959.  For over 60 years, Plaintiffs and their predecessor companies have been recognized by consumers as the source of high quality products bearing the AMWAY® trademark, beginning with cleaning products and expanding to nutrition, beauty, bath and body, cookware, household, and many other types of products.

48

163.    The AMWAY® trademark was first filed with the United States Patent and Trademark Office in 1960, and was registered in 1961.  Since that time, the AMWAY® trademark has been filed and registered with respect to numerous categories of goods and services.

164.    Alticor owns the Amway Trademarks and has licensed the Amway Trademarks to various subsidiaries, including Amway.

165.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

166.    Plaintiffs have expended substantial time, effort, money, and resources advertising and promoting products and services under the AMWAY® trademark.  As a result of Plaintiffs' efforts, the AMWAY® trademark is the means by which Amway products and services are distinguished from others in the marketplace.

167.    Plaintiffs market, advertise, and sell products bearing the AMWAY® trademark throughout the United States.

168.    Amway has implemented legitimate and substantial quality controls that it requires all IBOs to follow to protect the Amway name and family of brands.

169.    Consumers throughout the United States recognize and associate the Amway name with quality.

170.    Because of the quality, durability, and dependability of Amway products and Plaintiffs' use of the AMWAY® trademark, consumers trust the Amway name and Amway products.

171.    The AMWAY® trademark is inherently distinctive, and as a result of Plaintiffs' long and continuous use of the AMWAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Plaintiffs' products and services.

172. Amway is widely recognized as the designated source of goods bearing the AMWAY® trademark.

173. For these reasons, since at least 1970, the AMWAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

174. After the AMWAY® trademark became famous, beginning in or around 2022, Defendants have willfully used the AMWAY® trademark in connection with the unauthorized and illegal sale of products.

175. Because the products sold by Defendants do not come with the Satisfaction Guarantee, are intended for sale in Argentina rather the United States, and are not subject to and do not abide by Plaintiffs' quality controls, consumers who purchase products from Defendants are more likely to receive a poor quality, damaged, or defective product and have an unsatisfactory customer experience.

176. Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by IBOs are likely to associate that negative experience with Plaintiffs and the AMWAY® trademark. As a result, Defendants' unauthorized and willful use of the AMWAY® trademark is tarnishing and diluting the value and distinctive quality of the AMWAY® trademark.

177. Defendants' unlawful actions have harmed the reputation and goodwill associated with the AMWAY® trademark, and Plaintiffs have suffered and will continue to suffer immediate and irreparable injury. Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Amway products.

178.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

179.    Plaintiffs are entitled to recover their damages caused by Defendants' dilution of the AMWAY® Trademark and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

180.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

181.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith diluted the Amway Trademarks.

<u>**COUNT V**</u>
**Common Law Trademark Infringement and Unfair Competition**

182.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

183.    Plaintiffs are the owner and licensee of the Amway Trademarks.

184.    Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

185.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

186.    Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

187. The products that Defendants sell bearing the Amway Trademarks are not authorized for sale by Plaintiffs.

188. Defendants' use of the Amway Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

189. Defendants' use of the Amway Trademarks in connection with their unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

190. The products sold by Defendants are not, in fact, genuine and authentic Amway products. The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee, are intended for sale Argentina rather than the United States, and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

191. Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

192. As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

193.    Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

194.    Plaintiffs are entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights.

**COUNT VI**
**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/1 – 510/7**

195.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

196.    Plaintiffs are the owner and licensee of the Amway Trademarks.

197.    Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

198.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

199.    Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

200.    Defendants' use of the Amway Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

53

201. Defendants' use of the Amway Trademarks in connection with their unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

202. The products sold by Defendants are not, in fact, genuine and authentic Amway products. The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee, are intended for sale Argentina rather than the United States, and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

203. Defendants' use of the Amway Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Amway Trademarks is a deceptive trade practice under 815 ILCS 510/2. As a result of Defendants' conduct, Plaintiffs have suffered and continue to suffer immediate, and irreparable harm. This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will remain on Amazon permanently, harming Plaintiffs' reputation among consumers.

204. Plaintiffs have also suffered and continue to suffer damages including, but not limited to, damage to Plaintiffs' business relations, diminished goodwill, and reputational harm.

205. Pursuant to 815 ILCS 510/3, Plaintiffs are entitled to an injunction enjoining Defendants' unlawful conduct, and an award of attorneys' fees and costs.

206. Plaintiffs are entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights.

<u>COUNT VII</u>
**Tortious Interference with Existing Contracts and Business Relationships**

207.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

208.    Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through IBOs.

209.    Amway has entered into contracts with all of its IBOs that prohibit IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.

210.    Defendants are not and have never been IBOs, and Plaintiffs have not sold any Amway products to Defendants.  Despite this, Defendants have sold and are continuing to sell a high volume of products bearing the Amway Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more IBOs.

211.    Thus, upon information and belief, Defendants have purchased products bearing the Amway Trademarks from IBOs for the purpose of reselling them on the Internet.

212.    By purchasing products from IBOs and then reselling them on the Internet, Defendants caused and induced IBOs to breach their contracts with Amway.

213.    Defendants have known that Amway's contracts with IBOs prohibit IBOs from selling Amway products to third parties, such as Defendants, who the IBOs know or have reason to know are going to resell the products on the Internet.

214.    Defendants have known of this prohibition, among other reasons, because Amway regularly broadcasts that it does not allow Amway products to be sold on online marketplace and auction websites such as Amazon.  Experienced sellers of Amway products—such as

Defendants—are well aware that IBOs are prohibited from selling Amway products on such websites and from selling to resellers who sell on such websites.

215.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its IBOs by inducing IBOs to breach their contracts and sell products to Defendants that Defendants resold on Amazon.

216.    In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Amway products from IBOs—and in so doing, instigated a breach of the IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Trademarks by reselling the products on the Internet, thereby committing an independent tort.

217.    Amway's' agreements with IBOs are a specific class of contract that Defendants are causing IBOs to breach when they purchase products from IBOs for resale on the Internet. Although Plaintiffs do not yet know which specific IBOs(s) have breached their agreements with Amway—and indeed cannot learn that information with certainty until they are able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Plaintiffs' claim of tortious interference.

218.    Defendants are not parties to the contracts that they caused IBOs to breach.

219.    Defendants' actions have caused injury to Plaintiffs for which Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

220.    Plaintiffs are entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Judgment in favor of Plaintiffs and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      An accounting of Defendants' profits from their sales of infringing products bearing the Amway Trademarks;

C.      A permanent injunction enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

   i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Amway products;

   ii)     Prohibiting the Enjoined Parties from using any of the Amway Trademarks in any manner, including advertising on the Internet;

   iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Amway products as well as any products bearing any of the Amway Trademarks;

   iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Amway Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

   v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any Amway products or any of the Amway Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting Internet search engines (such as Google, Yahoo!, and Bing) to remove from the Internet any of the Amway Trademarks which associate Amway products or the Amway Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)    Requiring the Enjoined Parties to take all action to remove the Amway Trademarks from the Internet, including from the website www.amazon.com; and

viii)   Requiring Defendants to destroy or return to Plaintiffs all products bearing the Amway Trademarks in their possession, custody, or control;

D.      An award of attorneys' fees, costs, and expenses; and

E.      Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated:  April 17, 2024                    Respectfully submitted

                                          */s/ Daniel C.F. Wucherer*
                                          Daniel C.F. Wucherer
                                          VORYS, SATER, SEYMOUR AND PEASE LLP
                                          301 E. 4th Street, Suite 3500
                                          Cincinnati, Ohio 45202
                                          Tel: (513) 723-4093; Fax: (513) 723-4093
                                          dcwucherer@vorys.com

                                          **Attorneys for Plaintiffs Alticor Inc. and Amway Corp.**